# EXHIBIT A

**Master Freight Forwarding Services Subcontract**
**Terms and Conditions**

# ORIGINAL

## MASTER FREIGHT FORWARDING SERVICES CONTRACT

### By and Between

**MODEC OFFSHORE PRODUCTION SYSTEMS (SINGAPORE) PTE LTD**
and
**MODEC AND TOYO OFFSHORE PRODUCTION SYSTEMS PTE LTD**
and
**PANALPINA WORLD TRANSPORT SINGAPORE PTE LTD**

 **MODEC**



**Master Freight Forwarding Services Subcontract
Terms and Conditions**

# TABLE OF CONTENTS

| | | |
|---|---|---|
| 1.0 | DEFINITIONS | 4 |
| 2.0 | APPENDICES, WORK ORDER AND ITS EXHIBITS | 5 |
| 3.0 | CHANGES IN THE SERVICES | 6 |
| 3.1 | GENERAL | 6 |
| 3.2 | CHANGE ORDER | 6 |
| 3.3 | CHANGE ORDER DISPUTES | 6 |
| 4.0 | CONDUCT OF THE SERVICES | 6 |
| 4.1 | FAMILIARITY | 6 |
| 4.2 | STANDARD OF PERFORMANCE | 6 |
| 4.3 | SUBCONTRACTOR PERMITS | 6 |
| 4.4 | SUBCONTRACTOR'S PERSONNEL | 7 |
| 4.5 | INSPECTION | 7 |
| 4.6 | CONTRACTOR REPRESENTATIVE | 7 |
| 4.7 | SUBCONTRACTOR REPRESENTATIVE | 7 |
| 5.0 | COMPENSATION TO SUBCONTRACTOR | 8 |
| 5.1 | SCOPE OF COMPENSATION | 8 |
| 5.2 | PAYMENT FOR THE SERVICES | 8 |
| 5.3 | INVOICING INSTRUCTIONS | 8 |
| 5.4 | DISPUTED INVOICES | 8 |
| 6.0 | INDEMNITIES | 9 |
| 6.1 | SUBCONTRACTOR GROUP'S PERSONNEL AND PROPERTY | 9 |
| 6.2 | CONTRACTOR GROUP'S PERSONNEL AND PROPERTY | 9 |
| 6.3 | POLLUTION | 10 |
| 6.5 | INSURANCES | 10 |
| 6.6 | THIRD PARTIES | 11 |
| 7.0 | INSURANCE | 11 |
| 8.0 | TERMINATION | 13 |
| 8.1 | DEFAULT TERMINATION | 13 |
| 8.2 | NON-DEFAULT TERMINATION | 13 |
| 8.3 | SURVIVAL OF COVENANTS | 14 |
| 9.0 | OBLIGATIONS OF SUBCONTRACTOR | 14 |
| 9.1 | LAWS AND REGULATIONS | 14 |
| 9.2 | RECORDS | 14 |
| 10.0 | RELATIONSHIP OF PARTIES | 15 |
| 11.0 | PAYMENT OF BILLS; LIENS | 15 |

 **MODEC**

Panalpina

**Master Freight Forwarding Services Subcontract**
**Terms and Conditions**

|      | 11.1 | PAYMENT OF BILLS.................................................................................. 15 |
|      | 11.2 | LIEN RELEASES...................................................................................... 15 |
|      | 11.3 | LIEN WAIVERS........................................................................................ 16 |
|      | 11.4 | FINAL PAYMENT..................................................................................... 16 |
| 12.0 | **TAXES**......................................................................................................... 16 |
|      | 12.1 | TAXES.................................................................................................... 16 |
|      | 12.2 | CORPORATE AND INCOME TAXES......................................................... 17 |
| 13.0 | **SUBCONTRACTS, ASSIGNMENTS AND OTHER CONTRACTS** ................... 17 |
|      | 13.1 | SUBCONTRACTS.................................................................................... 17 |
|      | 13.2 | ASSIGNMENT......................................................................................... 17 |
|      | 13.3 | OTHER CONTRACTS.............................................................................. 17 |
| 14.0 | **CONFIDENTIALITY - PROPRIETARY INFORMATION, PATENTS AND INVENTIONS**18 |
|      | 14.1 | PROPRIETARY INFORMATION ............................................................... 18 |
|      | 14.2 | FAILURE TO COMPLY ............................................................................ 18 |
|      | 14.3 | PUBLICITY RELEASES ........................................................................... 18 |
| 15.0 | **FORCE MAJEURE** ....................................................................................... 18 |
| 16.0 | **APPLICABLE LAW** ...................................................................................... 19 |
| 17.0 | **NOTICES**.................................................................................................... 19 |
| 18.0 | **MISCELLANEOUS** ....................................................................................... 20 |
|      | 18.1 | ENTIRE AGREEMENT............................................................................. 20 |
|      | 18.2 | WAIVER.................................................................................................. 20 |
|      | 18.3 | CAPTIONS.............................................................................................. 20 |
|      | 18.4 | SEVERABILITY........................................................................................ 20 |
|      | 18.5 | ARBITRATION ........................................................................................ 20 |
|      | 18.6 | QUALITY CONTROL / CERTIFICATION.................................................... 21 |
| 19.0 | **PROHIBITION OF DRUGS AND ALCOHOL**....................................................... 21 |
| 20.0 | **HEALTH, SAFETY AND ENVIRONMENT**........................................................... 21 |
| 21.0 | **COMPLIANCE WITH LAWS**........................................................................... 22 |
| 22.0 | **FOREIGN CORRUPT PRACTICES ACT**............................................................ 23 |
| 23.0 | **TERM OF AGREEMENT**................................................................................. 24 |

0    **THIS** Agreement shall remain in full force and effect from the Effective Date until either the earlier of the date of termination of this Agreement in accordance with the provisions herein, or 2 years from the Effective Date and for the period set forth in any executed Work Order.

NON-EXCLUSIVity.................................................................................................24

Appendix A – Form of Work Order
Appendix B – Schedule of Unit Rates

 **MODEC**

Panalpina



**Master Freight Forwarding Services Subcontract**
**Terms and Conditions**

**THIS MASTER FREIGHT FORWARDING SERVICES SUBCONTRACT AGREEMENT** (the "*Agreement*") is made effective 1st day of July year 2014 (hereinafter "Effective Date") by and between:

**Panalpina World Transport (Singapore) Pte Ltd**, a Singapore private limited company, with its principal place of business at Loyang Offshore Supply Base, 25 Loyang Crescent (Box 5118), Block 105, TOPS Street 12, Singapore 508988 (hereinafter "SUB*CONTRACTOR*"); and

**MODEC OFFSHORE PRODUCTION SYSTEMS (SINGAPORE) PTE LTD**, a Singapore private limited company, with its principal place of business at 9 North Buona Vista Drive, The Metropolis Tower 1, #21-01(hereinafter "CONTRACTOR"); and

**MODEC and   TOYO OFFSHORE PRODUCTION SYSTEMS PTE LTD**, a Singapore private limited company, with its principal place of business at 9 North Buona Vista Drive, The Metropolis Tower 1, #21-01 (hereinafter "*CONTRACTOR*"),

Collectively CONTRACTOR and SUBCONTRACTOR are referred to as the "*Parties*" and individually as "*Party*").

## WITNESSETH

WHEREAS, CONTRACTOR has a need for Freight Forwarding and Logistic services in order to perform its own duties and responsibilities in its business operations, and

WHEREAS, SUBCONTRACTOR is willing to supply such Freight Forwarding and Logistic services to CONTRACTOR on the terms and conditions as set forth below:

**WHEREAS,** the Parties desire to establish cooperation in the field of Freight Forwarding Services and enter into an agreement to address the CONTRACTOR's needs for the SUBCONTRACTOR's services on a master agreement basis with each work assignment undertaken through a Work Order;

**WHEREAS,** the Parties confirm that this cooperation and execution of this Agreement shall not mean to establish exclusive cooperation relationship between the parties and each Party has its own liberty to order or accept such order of the other Party;

NOW, THEREFORE, for and in consideration of the premises and the mutual covenants of the parties herein exchanged and other good and valuable consideration, the sufficiency and adequacy of which is acknowledged, it is hereby agreed as follows:




Panalpina

Page 3 of 25

## 1.0    DEFINITIONS

When used herein, the following terms shall have the meanings set forth opposite such terms:

1.1     "Change Order" - The document to effect a change to the Services as described in Clause 3.2

1.2     "CONTRACTOR GROUP" is used as a reference individually and collectively for CONTRACTOR, its Client, its members, and its and their respective parents, subsidiaries and all affiliated corporations and its and all of their principals, officers, directors, employees, agents, permitted assigns, representatives and the subrogees of said parties.

1.3     "CONTRACTOR Representative" - The person or persons described in Clause 4.6.

1.4     "Defective Services" - That portion of the Services which does not conform to the requirements of this Agreement.

1.5     "Exhibits" - The Exhibits attached to the Work Order.

1.6     "Extra Work" - Any changes in Services affecting SUBCONTRACTOR's costs and upon which the Subcontract Price was calculated or additional Services outside the scope of the Services both of which must have been performed pursuant to Clause 3.

1.7     "Laws and Regulations" - The valid laws, rules, regulations, and orders (both civil and military) of the United States of America and all other governmental bodies having jurisdiction over the Services, or any part thereof, or any site where any part of the Services is performed.

1.8     "Other Parties" - Those parties as described in Clause 11.1.

1.9     "Services" - Furnishing of all materials and labor required under the provisions of this Agreement.

1.10    "Subcontract Price" - The total of the amount of compensation payable by CONTRACTOR to SUBCONTRACTOR under this Agreement as reflected in Clause 5 herein.

1.11    "SUBCONTRACTOR GROUP" is used as a reference individually and collectively for SUBCONTRACTOR and its parent, subsidiary and affiliated companies, SUBCONTRACTOR's subcontractors of all tiers and all other parties with whom SUBCONTRACTOR has a contractual relationship (with the exception of CONTRACTOR) and its and all of their officers, directors, employees, agents, assigns, representatives, contractors, and subcontractors, and the subrogees of said parties.

1.12    "SUBCONTRACTOR Permits" - Those permits described in Clause 4.3.

 **MODEC**

Panalpina



**Master Freight Forwarding Services Subcontract**
**Terms and Conditions**

## 2.0    APPENDICES, WORK ORDER AND ITS EXHIBITS

2.1    This Agreement consists of the Articles set out in this Agreement and any Appendices attached hereto:

**Appendices**

Appendix A -   Form of Work Order

| | |
|---|---|
| Exhibit A | Scope of Work |
| Exhibit B | (Not Used) |
| Exhibit C | (Not Used) |
| Exhibit D | Schedule (Project Specific) |
| Exhibit E | Compensation and Payment |
| Exhibit F | (Not Used) |
| Exhibit G | (Not Used) |
| Exhibit H | (Not Used) |
| Exhibit I | HSSE Requirements |
| Exhibit J | (Not Used) |

Appendix B -   Schedule of Unit Rates

2.2    **Work Order:** Any particular job or project which, during the term of this Agreement, CONTRACTOR requests SUBCONTRACTOR to perform and which SUBCONTRACTOR agrees to undertake shall be performed subject to the terms and conditions hereof, except as otherwise specifically expressly agreed to the contrary in writing by both Parties and as reflected in the Work Order. The terms and conditions applicable to each such assignment shall be set forth in each Work Order in the form attached hereto as Appendix A and shall be signed by the Parties. The Work Order shall set forth the details applicable to each aspect of the Work, the Subcontract Price, the applicable extra work rates, the applicable drawings, plans, Specifications, Work Schedule and all other matters appertaining to the Work. This Agreement shall be regarded as severally applicable to each job or project performed under the Work Order. As used in each of the hereinafter enumerated items, the "*Work*" shall be deemed as a reference to a particular or specific job or project which is performed pursuant to the provisions hereof, and the Agreement shall be deemed a reference to (i) this Subcontract as it applies, in severability to such Work as set forth in the executed Work Order, together with (ii) all other documents including, but not limited to, drawings, specifications, and stipulations, setting forth the agreement of the Parties as to such Work.

If there are any conflicts between the Agreement and Exhibit A of any Work Order entered into pursuant to this Agreement, then this Agreement shall prevail. In the event of any ambiguity, inconsistency or conflict between the Agreement and the other Exhibits of the Work Order, the Agreement shall prevail. In the event of any ambiguity, inconsistency or conflict amongst the various Exhibits then the earlier Exhibit shall control over the later Exhibits.

 **MODEC**

Panalpina

<b>Master Freight Forwarding Services Subcontract<br>Terms and Conditions</b>

## 3.0   CHANGES IN THE SERVICES

### 3.1   GENERAL

Within the scope of the Services, CONTRACTOR may make changes or adjustments to the Services by altering, adding to or deducting from the Services. If such changes do not affect SUBCONTRACTOR's costs to carry out the Services as originally described, SUBCONTRACTOR shall perform such changes without change in the Subcontract Price. If such changes affect SUBCONTRACTOR's costs, then upon mutual agreement there shall be an adjustment to SUBCONTRACTOR's compensation.

### 3.2   CHANGE ORDER

If any change in the Services results in an adjustment in the compensation, then upon CONTRACTOR's acceptance of SUBCONTRACTOR's proposal with respect to adjustments in the compensation, such change in the Services and adjustments in the compensation shall be confirmed by a written notice.

### 3.3   CHANGE ORDER DISPUTES

If there is no agreement on the amount of the adjustment of the applicable compensation for any changed condition, or if, because of attendant circumstances, there is insufficient time to negotiate such adjustment, then such changes shall, upon CONTRACTOR's order, be performed by SUBCONTRACTOR as Extra Work and be compensated in accordance with rates analogous with the rates established in Appendix B – Schedule of Unit Rates.

## 4.0   CONDUCT OF THE SERVICES

### 4.1   FAMILIARITY

SUBCONTRACTOR warrants and represents that it has undertaken a careful examination and investigation of the Services to be provided, that it is familiar with all phases thereof, including all reasonably foreseeable matters that may in any way affect the Services or its prosecution under this Agreement.

### 4.2   STANDARD OF PERFORMANCE

SUBCONTRACTOR shall prosecute the Services in a good and workmanlike manner, using qualified, experienced and efficient workers and properly designated and tested equipment and in strict conformity with the provisions of this Agreement and all applicable Laws and Regulations.

### 4.3   SUBCONTRACTOR PERMITS

SUBCONTRACTOR, at its own expense, shall procure and maintain all permits, licenses and other governmental authorizations from the appropriate authorities which are required for the prosecution of the

 **MODEC**                                                                                   Panalpina



Services and which must be obtained in the name of SUBCONTRACTOR ("SUBCONTRACTOR Permits").

### 4.4      SUBCONTRACTOR'S PERSONNEL

SUBCONTRACTOR shall employ only competent, skilled personnel for the Services. SUBCONTRACTOR shall keep on the job competent superintendent(s) who will be in charge of the Services. If, in the opinion of CONTRACTOR any superintendent fails or refuses to perform the Services in accordance with established standards, then CONTRACTOR may request that SUBCONTRACTOR remove such superintendent whereupon SUBCONTRACTOR shall replace said superintendent within five (5) calendar days. Such superintendent(s) shall have full authority to supply personnel, materials, supplies, and equipment as required for the expeditious prosecution of the Services in strict conformity with this Agreement. Copies of this Agreement shall be furnished by SUBCONTRACTOR to, and at all times shall be in the possession of, SUBCONTRACTOR's superintendent(s).

### 4.5      INSPECTION

The Services and all portions thereof shall be subject to inspection from time to time by inspectors appointed by the CONTRACTOR Representative. Neither failure to inspect nor failure to discover and reject any of the Services as not being in accordance with any provision of this Agreement shall be construed as an acceptance of such Services or to relieve SUBCONTRACTOR of any of its obligations under this Agreement.

SUBCONTRACTOR at its sole cost and expense shall forthwith correct, to the satisfaction of CONTRACTOR, any portion of the Services that is determined to be unsound or defective or that fails to conform to the provisions of this Agreement, due to any negligence or intentional act of SUBCONRACTOR, ("Defective Services").

### 4.6      CONTRACTOR REPRESENTATIVE

CONTRACTOR, by written notice to SUBCONTRACTOR, may designate one or more CONTRACTOR Representatives (collectively "CONTRACTOR Representative") who shall be authorized to act on behalf of CONTRACTOR; provided, however, that the CONTRACTOR Representative shall not have the authority to alter the terms or conditions of this Agreement. The CONTRACTOR Representative shall be authorized to certify on behalf of CONTRACTOR periodic estimates of Services completed which are submitted by SUBCONTRACTOR.

### 4.7      SUBCONTRACTOR REPRESENTATIVE

SUBCONTRACTOR, by written notice to CONTRACTOR, shall designate one or more SUBCONTRACTOR Representatives (collectively "SUBCONTRACTOR Representative") who shall be authorized to act for and on behalf of SUBCONTRACTOR. The SUBCONTRACTOR Representative shall be authorized to certify on behalf of SUBCONTRACTOR periodic estimates of Services completed which are submitted by CONTRACTOR and to bind SUBCONTRACTOR to any agreement executed

 **MODEC**

Panalpina



pursuant to this Agreement. Copies of the Agreement shall be furnished by SUBCONTRACTOR to, and shall at all times be kept in the possession of, the SUBCONTRACTOR Representative.

## 5.0    COMPENSATION TO SUBCONTRACTOR

### 5.1    SCOPE OF COMPENSATION

For performing the Services as described in this Agreement CONTRACTOR shall pay SUBCONTRACTOR the Subcontract Price which shall be compiled based off the Schedule of Unit Rates shown in Appendix B hereof.

### 5.2    PAYMENT FOR THE SERVICES

5.2.1    CONTRACTOR shall pay SUBCONTRACTOR each approved invoice in connection with the Services within forty five (45) calendar days after receipt and within fifteen (15) calendar days for invoices related to pre-paid expenses.

5.2.2    Prior to any payment under this Clause 5, SUBCONTRACTOR shall deliver to CONTRACTOR, marked to the attention of the CONTRACTOR Representative, an invoice setting forth a description of the Services covered by such invoice, the total compensation earned to date, the total payments previously made to SUBCONTRACTOR by CONTRACTOR, the payment then due for the period covered by the invoice and a statement that SUBCONTRACTOR has fully paid all of its subcontractors, laborers and material men for the Services covered by the invoice and that there are no claims outstanding from said subcontractors, laborers and material men.

### 5.3    INVOICING INSTRUCTIONS

5.3.1    On or before the tenth (10th) day of each calendar month SUBCONTRACTOR shall submit a detailed invoice to CONTRACTOR. Each such invoice shall be sent to CONTRACTOR at the address shown in Clause 17.

5.3.2    All invoices shall be supported by substantiating documentation as required by Work Order and Exhibit E. All invoices and substantiating documentation shall be subject to verification and approval by CONTRACTOR.

5.3.3    Delivery of each approved monthly report and invoice shall be deemed to be a certificate by SUBCONTRACTOR that all of the Services covered thereby have been completed in accordance with the provisions of this Agreement.

### 5.4    DISPUTED INVOICES

With respect to all invoices submitted pursuant to this Clause 5, CONTRACTOR shall notify SUBCONTRACTOR of the dispute and specific reasons behind such dispute, but shall pay all undisputed



**Panalpina**

portions within the forty-five (45) day period.    In the event that an invoice is disputed, SUBCONTRACTOR shall issue a credit note for the disputed portion of the invoice after which the undisputed portion of the invoice will be paid by CONTRACTOR. Payment and failure to object to all or any portion of an invoice shall not be construed as an acceptance of defective services or improper materials or a waiver of any right under this Agreement by CONTRACTOR.

## 6.0    INDEMNITIES

### 6.1    SUBCONTRACTOR GROUP'S PERSONNEL AND PROPERTY

SUBCONTRACTOR shall be liable in any case of illness, injury or death to the employees of any member of SUBCONTRACTOR GROUP and in any case of loss or damage to any member of SUBCONTRACTOR GROUP's property, equipment, barges, and tugs, whether owned or rented and operated by any member of SUBCONTRACTOR GROUP and including the property which is the subject of the Services arising out of or relating to the performance of the Services under this Agreement AND REGARDLESS OF WHETHER CAUSED OR BROUGHT ABOUT BY ANY MEMBER OF CONTRACTOR GROUP's NEGLIGENCE (INCLUDING ACTIVE, PASSIVE, SOLE, JOINT AND CONCURRENT NEGLIGENCE, BUT EXCLUDING GROSS NEGLIGENCE AND WILLFUL MISCONDUCT) OR ANY OTHER THEORY OF LEGAL LIABILITY, INCLUDING STRICT LIABILITY, THE UNSEAWORTHINESS OF ANY VESSEL, THE UNAIRWORTHINESS OF ANY AIRCRAFT, BREACH OF WWARRANTY, BREACH OF CONTRACT, AND INCLUDING PRE-EXISTING CONDITIONS and SUBCONTRACTOR shall defend, protect, indemnify and hold harmless all members of CONTRACTOR GROUP from and against any loss, cost, claim, obligation to indemnify another, suit, judgment, award or damage (including reasonable attorney's fees) on account of such illness, injury, death, loss or damage.

Notwithstanding anything to the contrary contained herein or elsewhere, for all claims related to or arising out of any loss, damage, or destruction of cargo, SUBCONTRACTOR's liability shall be the actual value of the lost, destroyed or damaged cargo not to exceed $1,000,000 per occurrence nor $3,000,000 in an annual aggregate. SUBCONTRACTOR's liability for any negligent freight forwarding and customs services shall be the actual damage not to exceed $1,000,000 per occurrence nor $3,000,000 per year.

### 6.2    CONTRACTOR GROUP'S PERSONNEL AND PROPERTY

CONTRACTOR shall be liable in any case of illness, injury or death to the employees of any member of CONTRACTOR GROUP and in any case of loss or damage to any member of CONTRACTOR GROUP's property, whether owned or rented and operated by any member of CONTRACTOR GROUP (excluding any loss or damage to the property which is the subject of the Services) arising out of or relating to the performance of the Services under this Agreement AND REGARDLESS OF WHETHER CAUSED OR BROUGHT ABOUT BY ANY MEMBER OF SUBCONTRACTOR GROUP's NEGLIGENCE (INCLUDING ACTIVE, PASSIVE, SOLE, JOINT AND CONCURRENT NEGLIGENCE, BUT EXCLUDING GROSS NEGLIGENCE AND WILLFUL MISCONDUCT) OR ANY OTHER THEORY OF LEGAL LIABILITY, INCLUDING STRICT LIABILITY OR THE UNSEAWORTHINESS OF ANY VESSEL OR THE UNAIRWORTHINESS OF ANY AIRCRAFT

 MODEC

Panalpina

AND INCLUDING PRE-EXISTING CONDITIONS and CONTRACTOR shall defend, protect, indemnify and hold harmless all members of SUBCONTRACTOR GROUP from and against any loss, cost, claim, obligation to indemnify another, suit, judgment, award or damage (including reasonable attorney's fees) on account of such illness, injury, death, loss or damage.

### 6.3    POLLUTION

SUBCONTRACTOR shall assume all responsibility for, including control and removal of, and defend, protect, indemnify and hold harmless all members of the CONTRACTOR Group and the Client from and against any loss, cost, suit, demand, judgment, award, obligation to indemnify another, or damage arising out of or relating to pollution or contamination which originates on or above the surface of the land or water from spills or leaks of fuel, lubricants, motor oil, pipe dope, paints, solvents, ballasts, bilge, garbage, sewerage, scrap steel and other materials emanating from the Work, SUBCONTRACTOR's vessels or equipment and the vessel being incorporated into or part of the Work and SUBCONTRACTOR agrees to protect, defend, indemnify and hold harmless all members of CONTRACTOR Group and the Client from and against any loss, cost, claim, suit, demand, judgment, award, obligation to indemnify another, penalty, fine, or damage arising out of the above **REGARDLESS OF WHETHER CAUSED OR BROUGHT ABOUT BY ANY MEMBER OF COMPANY GROUP's OR CLIENT'S NEGLIGENCE (INCLUDING ACTIVE, PASSIVE, SOLE, JOINT OR CONCURRENT NEGLIGENCE) OR ANY OTHER THEORY OF LEGAL LIABILITY, INCLUDING BREACH OF SUBCONTRACT, STRICT LIABILITY, THE UNSEAWORTHINESS OF ANY VESSEL AND THE UNAIRWORTHINESS OF ANY AIRCRAFT AND INCLUDING PRE-EXISTING CONDITIONS.**

### 6.4    CONSEQUENTIAL DAMAGES

Notwithstanding anything to the contrary contained elsewhere herein, neither SUBCONTRACTOR GROUP nor CONTRACTOR GROUP shall be liable to the other for any consequential, incidental, indirect or punitive damages of any kind or character, including, but not limited to, loss of use, loss of profit, loss of productivity, loss of efficiency, loss of revenue, loss of product or production, reservoir damage, or loss of hole damage due to blowout or cratering, whenever arising under this agreement or as a result of, relating to or in connection with the Services hereunder, and no claim shall be made by either SUBCONTRACTOR GROUP nor CONTRACTOR GROUP REGARDLESS OF WHETHER CAUSED OR BROUGHT ABOUT BY SUBCONTRACTOR GROUP's NEGLIGENCE (INCLUDING ACTIVE, PASSIVE, SOLE, JOINT AND CONCURRENT NEGLIGENCE, OR ANY OTHER THEORY OF LEGAL LIABILITY, INCLUDING STRICT LIABILITY OR THE UNSEAWORTHINESS OF ANY VESSEL OR THE UNAIRWORTHINESS OF ANY AIRCRAFT.

### 6.4    INSURANCES

The indemnity obligations voluntarily assumed by SUBCONTRACTOR and CONTRACTOR under this Clause 6 shall be supported by insurance and shall have coverage of $5,000,000 per occurrence. Subject always to the provisions of Article 7 herein, SUBCONTRACTOR agrees to have their underwriters name CONTRACTOR GROUP as additional assureds, but only to the extent of the indemnity obligations assumed by SUBCONTRACTOR herein, with full and complete waivers of subrogation in the policies

 **MODEC**

Panalpina



covering such illness, injury or death and damage to or loss or destruction of property to the extent of the indemnity obligations assumed by SUBCONTRACTOR. If it is judicially determined that the monetary limits of insurance required hereunder or the indemnities assumed under this Clause exceed the maximum monetary limits or scope permitted under applicable law, it is agreed that said insurance requirements or indemnities shall automatically be amended to conform to the maximum monetary limits or scope permitted under applicable law.

## 6.5    THIRD PARTIES

SUBCONTRACTOR shall be liable in any case of loss or damage to any Third Party personnel or Third Party property arising out of or related to the performance of the Services under the Agreement to the extent that such loss or damage is caused or brought about by SUBCONTRACTOR's negligence or other fault attributable to SUBCONTRACTOR or the un-seaworthiness of any vessel of any member of SUBCONTRACTOR GROUP, and SUBCONTRACTOR shall defend, protect, indemnify and hold harmless CONTRACTOR GROUP from and against any loss, cost, claim, suit, judgment, award, obligation to indemnify others or damage (including reasonable attorney's fees), including, but not limited to, wreck removal or pollution emanating therefrom on account of any such loss or damage.

## 7.0    INSURANCE

Subcontractor shall be required to provide, as a minimum, the insurances required and described below.

### 7.1.    General:

During the performance of the Work under this Subcontract, Subcontractor, at its sole expense, shall maintain the insurance coverages or their substantial equivalents and endorsements set forth herein below and with the insurance underwriters and upon terms acceptable to CONTRACTOR. Each insurance policy described below shall be endorsed as follows:

    7.1.1    To provide that underwriters shall waive their rights of subrogation against the CONTRACTOR, the Client, their subsidiaries and affiliated companies and co-lessees and co-venturers, if any, and their employees, officers, directors, agents and representatives;

    7.1.2    To provide thirty (30) calendar days' prior written notice of policy cancellation, material change or reduction of coverage to CONTRACTOR;

    7.1.3    To provide adequate territorial and marine limits;

    7.1.4    To the extent of Subcontractor's indemnity obligations set forth in this Subcontract, that Subcontractor's coverages are primary in relation to Sub-Clause 7.7 of this Clause 7 to any applicable insurance provided by CONTRACTOR or Client;

 **MODEC**

Panalpina



**Master Freight Forwarding Services Subcontract**
**Terms and Conditions**

7.1.5    To the extent permitted by applicable law, Subcontractor shall ensure that its underwriters name CONTRACTOR Group and Client as additional assureds, but only to the extent of the indemnity obligations assumed by Subcontractor in this Subcontract; and

7.1.6    Subcontractor shall provide CONTRACTOR with Certificates of Insurance with coverages as required herein prior to the commencement of the Work.

**7.2.    Workmen's Compensation:**

Subcontractor shall maintain a Workmen's Compensation policy complying with all of the statutory benefits required by the Workmen's Compensation and Occupational Disease laws of the state or country where operations are being conducted. The policy shall be endorsed to provide Employers Liability coverage for the following:

7.2.1    Endorsements for all locations in which the Work shall be performed;

7.2.2    Benefits and coverages to comply with U.S. Longshoremen's and Harbor Workers' Compensation Act and the OCS Lands Act;

7.2.3    "*Borrowed Servant*" endorsement, stating that a claim brought against CONTRACTOR as a "borrowed servant" by an employee of Subcontractor shall be treated as a claim against Subcontractor;

7.2.4    Voluntary Maritime Compensation with limits of $5,000,000 per occurrence; and

7.2.5    Any liability under the General Maritime Law including but not limited to the Jones Act and Death on the High Seas Act with a $5,000,000 limit.

**7.3.    Comprehensive General Liability:**

Subcontractor shall maintain a Comprehensive General Liability insurance policy covering all operations of the Subcontractor. This policy shall include the following:

7.3.1    Premises and Completed Operations;
7.3.2    Contractual Liability; and
7.3.3    Combined single limit of $5,000,000 per occurrence.

**7.4.    Comprehensive Automobile Liability:**

Subcontractor shall maintain a Comprehensive Automobile Liability insurance policy providing coverage for all owned, hired, and non-owned automobiles with the coverage limits of $1,000,000 per occurrence.

 **MODEC**

Panalpina



**7.5.  Excess Liability Insurance:**

Subcontractor shall maintain an Excess Liability Insurance policy supplementing the primary coverages of the policies required in Clauses 2, 3 and 4 of this Appendix with a limit of $5,000,000 per occurrence.

**7.6.  *Deleted.***

**7.7.  *Deleted***

# 8.0   TERMINATION

## 8.1   DEFAULT TERMINATION

8.1.1   If SUBCONTRACTOR or any of its subcontractors shall commit a breach of any provisions hereof and such breach shall not be corrected or corrective action commenced within forty eight (48) hours of the breach; or if SUBCONTRACTOR or any of its subcontractors shall refuse or neglect to supply a sufficiency of properly skilled workmen, materials, or equipment of the proper quantity or quality; or if SUBCONTRACTOR shall become insolvent, enter voluntary or involuntary bankruptcy or receivership, CONTRACTOR shall have the right (without prejudice to any other rights or remedies it may have hereunder or by operation of law) to terminate SUBCONTRACTOR's right to proceed with performance of this Agreement upon giving five (5) days notice to SUBCONTRACTOR, whereupon CONTRACTOR or its nominee shall be entitled, at its option, to remove the Services from SUBCONTRACTOR's possession (without interference) and take over and complete the performance of the Services.

8.1.2   In such event as described in Clause 8.1.1 hereinabove, SUBCONTRACTOR shall be entitled to receive compensation in the same manner as if CONTRACTOR had canceled the Agreement on the basis of non-default termination, less all additional costs and expenses incurred by CONTRACTOR in removing the Services and re-bidding and/or issuing a new Agreement as well as all costs in excess of those which would have been expended under the Agreement, with all such additional costs and expenses shall be mutually agreed, in writing within 45 days from the date of official notification of non-default termination, by both parties.

## 8.2   NON-DEFAULT TERMINATION

8.2.1   CONTRACTOR, at its sole discretion, may terminate this Agreement upon the giving of not less than ten (10) calendar days' prior written notice to SUBCONTRACTOR. Such termination shall be effective in the manner specified in such notice.

8.2.2   On receipt of such notice and unless otherwise directed in such notice, SUBCONTRACTOR shall discontinue the Services and the placing of orders for materials, equipment, and supplies and shall, if requested, make every effort to procure cancellation of all existing orders or contracts upon terms satisfactory to CONTRACTOR and shall thereafter do only such work as may be

 **MODEC**

Panalpina

necessary to preserve and protect the Services already in progress, materials, plant, and equipment at any Fabrication Site, or in transit.

      8.2.3    In the event of such termination by CONTRACTOR, CONTRACTOR shall pay to SUBCONTRACTOR the total of the following:

      (i)    That percentage of the Subcontract Price that is equivalent to the percentage of the Services completed as of the date of termination, less prior payments, if any, made to SUBCONTRACTOR in connection with the Services; and

      (ii)    Without duplication of the payment referred to in Clause 8.2.3(i), the net cost of materials, transportation, insurance, and handling for which SUBCONTRACTOR has made firm contracts that cannot be canceled and all amounts paid in settlement or termination of claims of subcontractors and suppliers, provided that CONTRACTOR shall be entitled to and shall receive the benefits under such contracts; and

      (iii)    The reasonable cost to SUBCONTRACTOR for removing and delivering to CONTRACTOR the Services actually finished or in progress at any Installation Site; or for securing the Services at any Installation Site as directed by the CONTRACTOR, plus a reasonable amount to cover the demobilization of SUBCONTRACTOR's equipment.

      8.2.4    In the event of non-default termination of this Agreement, SUBCONTRACTOR shall not be entitled to damages for loss of profits for the unexecuted portion of the Services or any other damages because of such termination.

## 8.3    SURVIVAL OF COVENANTS

Notwithstanding anything to the contrary contained elsewhere herein, the provisions of Clauses 6, 7, 8, 9, 11, 12, 14, 16 and 18.6 shall survive the termination, cancellation or early expiration of this Agreement.

## 9.0    OBLIGATIONS OF SUBCONTRACTOR

## 9.1    LAWS AND REGULATIONS

SUBCONTRACTOR shall perform the Services in strict compliance with this Agreement and the Laws and Regulations and shall indemnify and hold harmless CONTRACTOR from any and all penalties and liabilities for failure of SUBCONTRACTOR to so comply.

## 9.2    RECORDS

SUBCONTRACTOR shall maintain during the course of the Services, and retain for not less that five (5) years after Project Completion, complete and accurate records of all SUBCONTRACTOR's reimbursable costs which are charged to CONTRACTOR; and CONTRACTOR and its Client shall have the right to inspect, at any time and from time to time, and audit those records by its authorized representatives. The records to be thus maintained and retained by SUBCONTRACTOR shall include (without limitation):

 **MODEC**

Panalpina



(i)     Payroll records accounting for total time distribution of SUBCONTRACTOR's or its subcontractors' employees, whether working full-time or part-time on the Services (to permit tracing to payrolls), as well as canceled payroll checks;

(ii)    Unit inventory records for SUBCONTRACTOR's stock items; and

(iii)   Paid invoices and supporting documents for materials purchased and for subcontractors and any other third party charges.

CONTRACTOR's audit rights shall be limited to those portions of such records, which reflect the correctness of SUBCONTRACTOR's charges. The CONTRACTOR shall not be entitled to have access to said records, which pertain to SUBCONTRACTOR's general or operating overhead or its components or profits. All such audits shall be conducted on a mutually agreed upon date and time. If on SUBCONTRACTOR's premises, all security and HSE rules shall be obeyed.

## 10.0     RELATIONSHIP OF PARTIES

SUBCONTRACTOR shall be an independent contractor and any provisions of this Agreement that may appear to give CONTRACTOR or its representative the right to direct SUBCONTRACTOR as to the details of performing the Services or to exercise a measure of control over the Services shall be deemed to mean that SUBCONTRACTOR shall follow the desires of CONTRACTOR or its representative in the results of the Services only and not in the means whereby the Services is to be accomplished. SUBCONTRACTOR shall have authoritative control as to the details of doing the Services. The agents, representatives, or employees of SUBCONTRACTOR, or those of any of its subcontractors, shall not be deemed to be the agents, representatives, or employees of CONTRACTOR. SUBCONTRACTOR shall remain responsible for all of the actions of all of the subcontractors of SUBCONTRACTOR and the employees and agents of such subcontractors.

## 11.0     PAYMENT OF BILLS; LIENS

### 11.1     PAYMENT OF BILLS

SUBCONTRACTOR promptly shall pay all bills for labor and materials performed and furnished by SUBCONTRACTOR and parties claiming by, through, or under SUBCONTRACTOR ("Other Parties") in connection with the performance of the Services and, at CONTRACTOR's sole option, exercisable from time to time, SUBCONTRACTOR shall deliver to CONTRACTOR within ten (10) calendar days after receipt of CONTRACTOR's request, a notarized affidavit from each such subcontractor that all payments due and owing by SUBCONTRACTOR have been paid.

### 11.2     LIEN RELEASES

Notwithstanding any language contained herein to the contrary, and at CONTRACTOR's option, the final payment shall not be due to SUBCONTRACTOR by CONTRACTOR pursuant to the provisions of Clause 5 unless SUBCONTRACTOR shall have delivered to CONTRACTOR a duly executed affidavit



Panalpina



of payment and waiver of liens from each vendor, supplier and Subcontractor who has performed work or services for SUBCONTRACTOR related to the Agreement.  SUBCONTRACTOR agrees to indemnify and hold harmless CONTRACTOR from and against all liens and other encumbrances against any materials and equipment.  The CONTRACTOR shall have the right to participate in any defense and review any settlement in connection with the foregoing indemnity obligation, but such participation shall in no way constitute a waiver of SUBCONTRACTOR's obligations hereunder.

### 11.3    LIEN WAIVERS

To the maximum extent permitted by applicable law, SUBCONTRACTOR agrees that, in consideration of entering into this Agreement, SUBCONTRACTOR shall waive any and all right to lien any equipment and materials associated with the Services, except that SUBCONTRACTOR shall have the right to assess a lien only up to the amount of any unpaid and outstanding invoices..  SUBCONTRACTOR acknowledges that in entering into this Agreement, SUBCONTRACTOR shall look solely and exclusively to CONTRACTOR for payment and shall not rely on any statutory, common law or other right to lien or encumber the property of CONTRACTOR.  Accordingly, SUBCONTRACTOR agrees to keep and maintain CONTRACTOR'S property lien free from any liens asserted by SUBCONTRACTOR or any of its subcontractors both during and after completion of the Services.

### 11.4    FINAL PAYMENT

The final payment provided for in Clause 5 of the Agreement shall not become due until SUBCONTRACTOR delivers to CONTRACTOR an affidavit that attests that there are no debts for which a lien could be filed upon CONTRACTOR's property.  SUBCONTRACTOR shall indemnify, defend and hold harmless CONTRACTOR from and against all liens and other encumbrances against CONTRACTOR's property.  CONTRACTOR shall have the right to participate in any defense and review any settlement in connection with the foregoing indemnity obligation, but such participation shall in no way constitute a waiver of SUBCONTRACTOR's obligations under such indemnity obligation.

## 12.0    TAXES

### 12.1    TAXES

As between SUBCONTRACTOR and CONTRACTOR, SUBCONTRACTOR shall have sole and exclusive liability for the payment of any and all taxes and contributions for sickness and unemployment insurance, old age retirement benefits, life pensions, annuities, and similar benefits which may now or hereafter be imposed by law or agreement with respect to persons employed by SUBCONTRACTOR or any of its subcontractors for performance of the Services including all sales, use and ad valorem taxes. SUBCONTRACTOR shall comply with all Laws and Regulations applicable to the compensation paid to its employees or the employees of any of its subcontractors.  The compensation to be paid to SUBCONTRACTOR includes, and SUBCONTRACTOR shall be liable for and shall pay and shall indemnify and hold harmless CONTRACTOR from and against, all such taxes and contributions, including without limitation any interest accrued and penalties imposed thereon.

 MODEC

Panalpina



## 12.2   CORPORATE AND INCOME TAXES

Notwithstanding anything to the contrary contained herein, it is not intended that CONTRACTOR be liable to SUBCONTRACTOR for the reimbursement of any corporate franchise taxes or any taxes levied directly or indirectly on or measured by income or chargeable gains or special assessments of any kind or nature.

## 13.0   SUBCONTRACTS, ASSIGNMENTS AND OTHER CONTRACTS

### 13.1   SUBCONTRACTS

SUBCONTRACTOR shall not enter into any subcontract without CONTRACTOR's prior written consent and approval.  No subcontract shall bind or purport to bind CONTRACTOR, but to the extent possible, all subcontracts shall contain provisions permitting assignment thereof to CONTRACTOR. SUBCONTRACTOR shall be fully responsible to CONTRACTOR for any work of its subcontractors. SUBCONTRACTOR agrees to incorporate the terms and conditions of this Agreement into each subcontract.  Notwithstanding the foregoing, consent is hereby granted to SUBCONTRACTOR to utilize those subcontractors that are routinely utilized in forwarding services including warehouse, brokerage and transport service providers only after submission of lists of the service providers and upon approval by CONTRACTOR.

### 13.2   ASSIGNMENT

SUBCONTRACTOR may not assign this Agreement or any portion thereof without CONTRACTOR's prior written consent.  Subject to the foregoing, this Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors and assigns.

Upon prior written notice to SUBCONTRACTOR, CONTRACTOR may assign the contract to any third party, including, but not limited to, its Client, whereupon said third party shall have all of the right of CONTRACOR under the contract.

### 13.3   OTHER CONTRACTS

CONTRACTOR may perform services not covered by this Agreement, changes in the Services or Services that are incomplete in the event of the termination of this Agreement under Clause 8 hereof and CONTRACTOR may award contracts to others for any part hereof.  SUBCONTRACTOR shall cooperate fully with the CONTRACTOR and with such other contractors.  SUBCONTRACTOR shall not commit any act that would interfere directly or indirectly with the performance of the work of CONTRACTOR or its other contractors; nor shall CONTRACTOR or its other contractors interfere with or impede the performance by SUBCONTRACTOR of the Services under this Agreement.  SUBCONTRACTOR shall not assert or make and hereby waives any and all claims for any delays experienced by any such other party.



Panalpina

## 14.0   CONFIDENTIALITY - PROPRIETARY INFORMATION, PATENTS AND INVENTIONS

### 14.1   PROPRIETARY INFORMATION

SUBCONTRACTOR recognizes and agrees that all drawings, specifications and other materials relating to the Services under this Agreement contain and comprise confidential and proprietary information and/or trade secrets of CONTRACTOR, its vendors or its Client.  SUBCONTRACTOR and its subcontractors, and their respective agents and employees shall maintain all such information and materials in strictest confidence and shall not disclose the same to any third party, nor utilize the same directly or indirectly in their business (except for the purpose contemplated by this Agreement), nor incorporate the same in any product sold to or services performed for third parties at any time before or after the termination of this Agreement without the prior written consent of CONTRACTOR.  The obligations of confidentiality, as expressed in this Clause, shall not apply to any information that SUBCONTRACTOR can prove (i) was known to or used by SUBCONTRACTOR prior to the disclosure thereof by CONTRACTOR; or (ii) is disclosed by a third party to SUBCONTRACTOR without violation of any confidential obligation, before disclosure thereof by CONTRACTOR; or (iii) is published or otherwise becomes generally known and used by others without fault of SUBCONTRACTOR before or after disclosure thereof by CONTRACTOR.

### 14.2   FAILURE TO COMPLY

Failure to strictly conform to the provisions of this Clause 14 shall constitute a substantial breach of this Agreement by SUBCONTRACTOR and shall authorize CONTRACTOR to seek all damages resulting from such breach and to seek an injunction in any court of competent jurisdiction to restrain SUBCONTRACTOR from further failure to strictly conform to the provisions hereto.

### 14.3   PUBLICITY RELEASES

Subcontractor shall make no publicity releases or announcements concerning the activities of the Contractor or participation with respect to this Agreement without the prior written consent of Contractor.

## 15.0   FORCE MAJEURE

Any delays in or failures of performance by either Party shall not constitute default hereunder or give rise to any claims for damages, if and to the extent such delays or failures of performance are caused by occurrences of Force Majeure.  For purposes of this Agreement, Force Majeure includes, but is not limited to, Acts of God, acts of the public enemy, Laws and Regulations, wars or warlike action (whether actual or impending) arrests and other restraints of government (civil or military), blockades, insurrections, riots, epidemics, landslides, lightning, earthquakes, fires, sabotage, tropical storms and hurricanes, civil disturbances, tidal waves, explosions, confiscation or seizure by any government or other public authority, and any other causes, whether of the kind herein enumerated or otherwise, that are not reasonably within the control of the Party claiming a suspension and that could not have been overcome by the exercise of ordinary diligence but shall not include CONTRACTOR's obligations to make

**MODEC**

Panalpina



## 18.0   MISCELLANEOUS

### 18.1   ENTIRE AGREEMENT

This Agreement constitutes the entire agreement and supersedes all prior agreements, promises, correspondence, discussions, representations and understandings, except those expressly set forth herein. No other agreements, promises, correspondence, discussions, representations or understandings, either express or implied, unless expressly set forth herein, are binding between the Parties.

### 18.2   WAIVER

No benefit or right accruing to either Party hereunder shall be waived unless the waiver is reduced to writing and signed by both parties to this Agreement. The failure of either Party to exercise any of its rights hereunder shall in no way constitute a waiver of those rights, nor shall such failure excuse the other Party from any of its obligations.

### 18.3   CAPTIONS

The captions used in this Agreement are for convenience only and shall in no way define, limit, or describe the scope or intent of this Agreement or any part thereof.

### 18.4   SEVERABILITY

If in any legal proceeding a competent tribunal, including, but not limited to, judicial courts or arbitration tribunals, shall refuse to enforce any provision of this Agreement, the scope of such unenforceable provision shall be deemed modified and diminished to the extent necessary to render such provision valid and enforceable. In any event, the validity of enforceability of any provision shall not affect any other provision hereof, and the Agreement shall be construed and enforced as if such unenforceable provision had not been included.

### 18.5   ARBITRATION

All claims, disputes or controversies arising out of, or in relation to the interpretation, application or enforcement of this Agreement shall be decided by resort of either Party to arbitration utilizing a single arbitrator in accordance with the Construction Industry Rules of the American Arbitration Association. The arbitration shall be held in Houston, Texas. The decision of the arbitrator shall be final, binding and enforceable in any court of competent jurisdiction and the Parties agree that there shall be no appeal from the arbitrator's decision. All statutes of limitation that would otherwise be applicable shall apply to any arbitration proceeding. With the exception of the exchange of documents, there shall be no interrogatories, depositions or other discovery between the Parties. The Parties acknowledge and agree that this Agreement includes activities in Interstate Commerce and that the Federal Arbitration Act, 9 U.S.C. § 1et seq, shall control and apply to all arbitrations conducted hereunder, notwithstanding any state law provisions to the contrary.

 **MODEC**

Panalpina

**Master Freight Forwarding Services Subcontract
Terms and Conditions**

payments to SUBCONTRACTOR including for any additional costs or fees that are incurred by reason of such Force Majeure including protection of CONTRACTOR's cargo, alternate transport, storage, etc. The Party experiencing Force Majeure shall notify the other Party with reasonable promptness of the existence of any such Force Majeure and the probable duration thereof, and shall provide the other Party from time to time with correct information concerning same. The Party experiencing Force Majeure shall take all reasonable actions to remove the cause of Force Majeure.

## 16.0   APPLICABLE LAW

THIS AGREEMENT SHALL BE INTERPRETED AND CONSTRUED IN ACCORDANCE WITH UNITED STATES GENERAL MARITIME LAW EXCLUDING ANY CONFLICTS OF LAWS PRINCIPLES WHICH WOULD DIRECT THE SUBSTANTIVE LAW OF ANOTHER JURISDICTION TO APPLY.   TO THE EXTENT THAT UNITED STATES GENERAL MARITIME LAW IS INAPPLICABLE TO THIS AGREEMENT, THE LAWS OF THE STATE OF TEXAS, EXCLUSIVE OF ITS PRINCIPLES OF CONFLICTS OF LAWS, SHALL CONTROL THE VALIDITY, CONSTRUCTION AND INTERPRETATION OF THIS AGREEMENT.

IT IS AGREED BETWEEN ALL PARTIES THAT UNITED STATES GENERAL MARITIME LAW, ESPECIALLY THE UNITED STATES COGSA, SHALL APPLY TO THE ENTIRE MULTIMODAL TRANSPORT CHAIN.

## 17.0   NOTICES

Any notification under this Agreement shall be well and sufficiently served on the party concerned if delivered by hand or sent by telefax or recorded delivery post to the following addresses:

**SUBCONTRACTOR:**

Panalpina World Transport (Singapore) Pte Ltd
Loyang Offshore Supply Base, 25
Loyang Crescent (Box 5118), Block 105, TOPS Street 12,
Singapore 508988

Attention : Dan Chua
Area Head of Oil & Gas Southeast Asia
Senior Vice President

**CONTRACTOR:**

MODEC Offshore Production Systems (Singapore) Pte. Ltd

9 North Buona Vista Drive, The Metropolis Tower 1, #21-01, Singapore 059567

Attention: Sateesh Dev

President of MODEC Offshore Production Systems (Singapore) Pte. Ltd

Director of MODEC and TOYO Offshore Production Systems Pte Ltd

 **MODEC**



### 18.6    QUALITY CONTROL / CERTIFICATION

SUBCONTRACTOR shall adhere to a Quality Management System similar to that given in ISO 9000. SUBCONTRACTOR shall demonstrate compliance with its own management system, approved by CONTRACTOR.

## 19.0    PROHIBITION OF DRUGS AND ALCOHOL

SUBCONTRACTOR is responsible for ascertaining, maintaining, and monitoring the alcohol and drug free status of its employees who are employed at any jobsite and, to that end, agrees to the following minimum requirements:

19.1    CONTRACTOR reserves the right to ban from the jobsite any SUBCONTRACTOR employee or any employee of SUBCONTRACTOR's subcontractors who cannot establish that they are drug and alcohol free to CONTRACTOR's satisfaction. No employee of SUBCONTRACTOR or its subcontractors shall be permitted to perform Services at the jobsite without consenting to undergo periodic drug or alcohol screening tests.

19.2    If the performance of any employee of SUBCONTRACTOR or its subcontractors at the jobsite appears erratic or impaired or after any accident or safety violation where, in CONTRACTOR 's sole opinion, such employee's actions indicate that the accident or violation could reasonably have been caused by alcohol or drug use, CONTRACTOR may direct the SUBCONTRACTOR to remove such employee from the jobsite at SUBCONTRACTOR's cost. No employee so removed shall be permitted to return to the jobsite without first undergoing a medical examination, which establishes to CONTRACTOR's satisfaction that the condition was not drug or alcohol related.

19.3    CONTRACTOR reserves the right to undertake a search of SUBCONTRACTOR's employee's and its subcontractor's employee's personal effects at any time during the term of this Agreement to ascertain whether such employees have in their possession drugs, alcohol or any other controlled dangerous substance and the unexcused possession of such will constitute cause for SUBCONTRACTOR to immediately seek replacement of such employees. Notwithstanding any compliance by SUBCONTRACTOR with the requirements set forth herein, and notwithstanding CONTRACTOR's satisfaction with SUBCONTRACTOR's means of demonstrating compliance herewith, SUBCONTRACTOR shall be and remain fully responsible for any and all failures, and the consequences thereof, to insure that its and its subcontractor's employees are drug and alcohol free while working onboard the Vessel or at the jobsite.

## 20.0    HEALTH, SAFETY AND ENVIRONMENT

20.1    SUBCONTRACTOR GROUP employees shall strictly comply with all statutory regulations, CONTRACTOR HSE requirements identified in Exhibit I and any other requirements pertaining to health, safety and environmental protection which are applicable to the location where SUBCONTRACTOR is performing its work or services.

 **MODEC**

Panalpina



20.2     SUBCONTRACTOR shall be wholly responsible for the safety and safe working practices of its and its subcontractors' employees and all its equipment, and shall be responsible for the training of its employees and those of its lower tier subcontractors on safety and safe working practices. SUBCONTRACTOR shall ensure that the SUBCONTRACTOR GROUP's employees are adequately trained in safety precautions and safe working practices before they are involved in the work or services provided hereunder and that they are competent to undertake their required duties in a safe and efficient manner.

20.3     SUBCONTRACTOR shall, at its own expense, as a minimum ensure that SUBCONTRACTOR GROUP's employees receive the required training (e.g. induction, supervisory, survival, emergency response, safety management and specific safety skills) from an established, qualified and recognized training establishment. All costs therefore shall be deemed to be included in the prices.

20.4     SUBCONTRACTOR shall, at its own expense, supply to all SUBCONTRACTOR GROUP's employees, adequate personal protective clothing and protective equipment which shall satisfy generally accepted marine industry standards. Such protective equipment shall be supplied and always maintained in good condition at SUBCONTRACTOR's expense and such expense shall be deemed to be included in the prices.

## 21.0   COMPLIANCE WITH LAWS

21.1     It is agreed that in the performance of the Services, all operations shall be conducted in full compliance with any and all valid and applicable laws, rules, and regulations adopted by any governmental agency, whether local, state or federal and in accordance with generally accepted industry standards.

21.2     As a condition to CONTRACTOR entering into this Agreement, SUBCONTRACTOR hereby represents, warrants and agrees that SUBCONTRACTOR shall be bound and abide by and strictly comply with both the letter and the spirit of the Foreign Corrupt Practices Act of 1977 and all amendments thereto as the same is from time to time in force in the United States of America. Without limiting the generality of the foregoing, SUBCONTRACTOR has not made and shall not make, in the performance of this Agreement, an offer, payment, promise to pay, or authorization of the payment of any money, or offer, gift, promise to give, or authorization of the giving of anything of value, directly or indirectly (i) to or for the use or benefit of any official or employee of any Government or instrumentality thereof or the agencies of such Government, (ii) to any other person if the SUBCONTRACTOR or any partner, officer, director, employee, agent, representative or shareholder of the SUBCONTRACTOR knows or has reason to suspect or know that any part of such thing of value will be directly or indirectly offered, given or promised, directly or indirectly, to any such Governmental officer or employee or political party or official thereof, or candidate for political office, or (iii) to any other person or entity, the payment of which would violate the laws or policies of the United States in order to affect or influence any act or decision of such official or employee.



21.3    SUBCONTRACTOR hereby represents, warrants and agrees that SUBCONTRACTOR shall be bound and abide by and strictly comply with the provisions of the Export Administration Act, Section 999 of the Internal Revenue Code, the trading With The Enemy Act, the International Emergency Economic Powers Act, and the Arms Export Control Act, and any amendments thereto as are from time to time in force in the United States of America, and any implementing regulations promulgated pursuant thereto.

## 22.0    FOREIGN CORRUPT PRACTICES ACT

As a condition to CONTRACTOR issuing this Subcontract to SUBCONTRACTOR, SUBCONTRACTOR hereby represents, warrants and agrees that SUBCONTRACTOR shall be bound and abide by and strictly comply with both the letter and the spirit of the applicable anti-bribery, anti-corruption, and anti-money laundering laws, rules, regulations, decrees and/or official governmental orders of the United States, the United Kingdom, and the jurisdiction in which the Goods or Services are supplied, including, without limitation, the U.S. Foreign Corrupt Practices Act (the "*FCPA*"), and the U.K. Anti-Terrorism, Crime and Security Act 2001 and successor legislation, as well as any other applicable legislation implementing either the United Nations Convention Against Corruption or the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions (collectively referred to as "*Anti-Corrupt Practices Laws*"). Without limiting the generality of the foregoing, SUBCONTRACTOR has not made and shall not make, in the performance of this Subcontract, any offer, payment, promise to pay, or authorization of the payment of any money, or offer, gift, promise to give, or authorization of the giving of anything of value, directly or indirectly in violation of the Anti-Corrupt Practices Laws including, but not limited to:

(i)    to or for the use or benefit of any official or employee of any Government or instrumentality thereof or the agencies of such Government,

(ii)    to any other person if the SUBCONTRACTOR or any partner, officer, director, employee, agent, representative or shareholder of the SUBCONTRACTOR knows or has reason to suspect or know that any part of such thing of value will be directly or indirectly offered, given or promised, directly or indirectly, to any such Governmental officer or employee or political party or official thereof, or candidate for political office, or

(iii)    to any other person or entity, the payment of which would violate the laws or policies of the United States in order to affect or influence any act or decision of such official or employee.

Further, SUBCONTRACTOR hereby represents, warrants and agrees that SUBCONTRACTOR shall be bound and abide by and strictly comply with the provisions of the Export Administration Act, Section 999 of the Internal Revenue Code, the trading With The Enemy Act, the International Emergency Economic Powers Act, and the Arms Export Control Act, and any amendments thereto as are from time to time in force in the United States of America, and any implementing regulations promulgated pursuant thereto.

(a) *Disclosure Controls and Procedures.*    SUBCONTRACTOR agrees and undertakes that in connection with this Subcontract and in connection with any other business transactions involving CONTRACTOR and SUBCONTRACTOR and the jurisdiction in which the Services are supplied, SUBCONTRACTOR has applied, and will apply, effective disclosure controls and procedures.

(b) *Continuing Effect and Survival of Representation, Warranties and Covenants.*    All of the foregoing representations, warranties and covenants shall be continuing in effect and shall survive for a

 **MODEC**

Panalpina



period of sixty (60) months after completion, expiration, or termination of the Subcontract. SUBCONTRACTOR shall be obliged to immediately inform the CONTRACTOR if any of the foregoing representations and warranties ceases to be accurate, in whole or in part.

(c)      Right of Termination Due to Evidence of Violations.  In the event the CONTRACTOR has any reasonable basis to believe that SUBCONTRACTOR may not be in compliance in any material way with the undertakings and/or requirements set forth in this Clause 22, CONTRACTOR shall advise SUBCONTRACTOR in writing of its belief and SUBCONTRACTOR shall fully cooperate with any and all inquiries undertaken by or on behalf of the CONTRACTOR. Without prejudice to any other rights the CONTRACTOR may have hereunder, under the Subcontract or at law (including, as applicable, the right of damages for breach of contract), the CONTRACTOR shall have the right to terminate this Subcontract with immediate effect if any of the foregoing agreements, representations, warranties, covenants, undertakings, or requirements set forth in this Clause 22 have not been complied with or fulfilled by SUBCONTRACTOR.

## 23.0    TERM OF AGREEMENT

This Agreement shall remain in full force and effect from the Effective Date until either the earlier of the date of termination of this Agreement in accordance with the provisions herein, or 2 years from the Effective Date and for the period set forth in any executed Work Order.

## 24.0    NON-EXCLUSIVITY

This Agreement is signed on a non-exclusive basis. The CONTRACTOR shall have no limitation on its right to obtain the Services from any other source at any time during the Term of this Agreement and any Work Order.



Panalpina



**Master Freight Forwarding Services Subcontract**
**Terms and Conditions**

IN WITNESS WHEREOF, CONTRACTOR and SUBCONTRACTOR have executed this Agreement effective as of the date first set forth hereinabove.

For and on behalf of:

**Modec Offshore Production Systems (Singapore) Pte Ltd and**

**Modec and Toyo Offshore Production Systems Pte Ltd**

..............................................
**Sateesh Dev**
President of Modec Offshore Production Systems (Singapore) Pte Ltd

Director of Modec And Toyo Offshore Production Systems Pte Ltd

**Panalpina World Transport (Singapore) Pte Ltd**

..............................................
Desmond Lim
Country Managing Director, Singapore

..............................................
Peter Gachwiler
Regional Head of Finance, APAC

 MODEC

Panalpina

**Master Freight Forwarding Services Subcontract**

## APPENDIX A
## FORM OF WORK ORDER
### Work Order No. _____

Pursuant to Master Freight Forwarding Services Agreement between CONTRACTOR and SUBCONTRACTOR dated _____ day of _____ 201_ (the "Master Agreement"), this Work Order No. _____is made on _____ day of June, year 201_ (the "Effective Date") in respect of the Services to be supplied by SUBCONTRACTOR as listed below:

(1)    **Services to be provided by SUBCONTRACTOR:**

SUBCONTRACTOR shall carry out the Services for the _____ Project all as further described in:

|  |  |
|---|---|
| Exhibit A | Scope of Work |
| Exhibit B | (Not Used) |
| Exhibit C | (Not Used) |
| Exhibit D | Work Schedule (Project Specific) |
| Exhibit E | Compensation and Payment |
| Exhibit F | (Not Used) |
| Exhibit G | (Not Used) |
| Exhibit H | (Not Used) |
| Exhibit I | HSSE Requirements |
| Exhibit J | (Not Used) |

(2)    **Location of Services to be provided by SUBCONTRACTOR:**

2.1    The Services shall be performed at CONTRACTOR's offices located at, Singapore, or other locations as maybe designated by CONTRACTOR.

(3)    **Period for the Services to be provided by SUBCONTRACTOR:**

3.1    The Services shall be performed in accordance with the schedule included in Exhibit D.

(4)    **Fees/Charges payable to SUBCONTRACTOR for the above Services:**

4.1    The Services shall be compensated in accordance with Appendix B – Schedule of Unit Rates – Compensation and Payment of the Master Agreement.

(5)    **Special requirements:**

**[CONTRACTOR]**

By: _____
Name: _____
Title: _____

**[SUBCONTRACTOR]**

By: _____
Name: _____
Title: _____

 MODEC

Panalpina



**Master Freight Forwarding Services Subcontract**
**Terms and Conditions**

## APPENDIX B
## SCHEDULE OF UNIT RATES

### I. Unit Rates and Prices

Details of unit rates & pricings are provided in Appendix 1 to 20 as attached.

### II. Definitions to be applied
#### a.   Air Freight

The term "kg" is to be understood to mean per kilogram chargeable weight, based on a weight / volume ratio of 1:6, whichever yields more.  That is 1000 kg = 6 cbm.  All charges will be raised on actual weights / measurements of the cargo, irrespective of weights / measurements shown on the airway bill and or manifest.

#### b.   Sea Freight / General Cargo

The term "Freight Ton Weight/Measure" and "Revenue Ton" is to be understood to mean per 1000 kg or 1 cbm, whichever yields more. All charges will be raised on actual weights / measurements of the cargo irrespective of weights / measurements shown on the Bill of Lading and/or manifest.

The term "20'/40' Container" is to be understood to mean commonly used shipping line equipment. For containers with other dimensions, porta-cabins, open top containers, flat racks containers etc. the non-containerized general cargo tariff shall apply.

### III. Incentive Program

The incentive program would be comprised of a Quarterly refund to CONTRACTOR based on Freight and Service Spend.  Proposed value of incentive to be based on indicated % per USD 1,000,000 spent with SUBCONTRACTOR over a defined period to be named in agreement by both parties.

- CONTRACTOR freight and Services spend: USD 1,000,000 – Refund to CONTRACTOR: <u>NIL</u> paid quarterly upon audit
- CONTRACTOR freight and Services spend: USD 5,000,000 – Refund to CONTRACTOR: <u>NIL</u> paid quarterly upon audit.
- CONTRACTOR freight and Services spend: USD10,000,000 – Refund to CONTRACTOR: <u>NIL</u> paid quarterly upon audit

Incentives shall be applied to freight and Services only on per project basis.

### IV. Schedule of Unit Rates

 **MODEC**

Panalpina

Master Freight Forwarding Services Subcontract

## APPENDIX B

### IV. SCHEDULE OF UNIT RATES
(129 pages)

 **MODEC**



Master Freight Forwarding Services Subcontract

## TABLE OF CONTENTS

| Appendix | Description | Page |
|---|---|---|
| | **Air Freight** | |
| 1.1 | Rate Schedule to Singapore | 1 |
| 1.2 | Rate Schedule to Bangkok (Thailand) | 2 |
| 1.3 | Rate Schedule to Kuala Lumpur (Malaysia) | 3 |
| 1.4 | Rate Schedule to Shanghai (Republic of China) | 4 |
| 1.5 | Rate Schedule to Dalian (Republic of China) | 5 |
| 1.6 | Rate Schedule to Beijing and/or Tianjin (Republic of China) | 6 |
| 1.7 | Rate Schedule to Rio De Janerio - Galeao International Airport - GIG  (Brazil) | 7 |
| 1.8 | Rate Schedule to Sao Paulo - Guarulhos International Airport - GRU (Brazil) | 8 |
| 1.9 | Rate Schedule to El Salvador  - Magalhães International Airport - SSA (Brazil) | 9 |
| 1.10 | Rate Schedule to Los Angeles or San Francisco (U.S.A - West Coast) | 10 |
| 1.11 | Rate Schedule to New York or Chicago (U.S.A - East Coast) | 11 |
| 1.12 | Rate Schedule to Dallas or Texas (U.S.A - Gulf Coast) | 12 |
| 1.13 | Rate Schedule to Takoradi (Ghana) | 13 |
| 1.14 | Rate Schedule to Accra (Ghana) | 14 |
| 1.15 | Rate Schedule to Tema (Ghana) | 15 |
| 1.16 | Rate Schedule to Tokyo, Narita Airport (Japan) | 16 |
| | | |
| | **Breakbulk Freight (Including RO-RO)** | |
| 2.1 | Rate Schedule to Singapore (Singapore) | 17-19 |
| 2.2 | Rate Schedule to Laem Chabang (Thailand) | 20-22 |
| 2.3 | Rate Schedule to Dalian (China) | 23-25 |
| 2.4 | Rate Schedule to Shanghai (China) | 26-28 |
| 2.5 | Rate Schedule to Xingang (China) | 23-31 |
| 2.6 | Rate Schedule to Rio De Janerio (Brazil) | 32-34 |
| 2.7 | Rate Schedule to Sao Paulo (Brazil ) | 35-37 |
| 2.8 | Rate Schedule to El Salvador  (Brazil) | 38-40 |
| 2.9 | Rate Schedule to  Santos (Brazil) | 41-43 |
| 2.10 | Rate Schedule to Yokohama (Japan) | 44-46 |
| 2.11 | Rate Schedule to Chiba  (Japan) | 47-49 |
| | | |
| | **FCL (Full Container)** | |
| 3.1 | Rate Schedule to Singapore | 50-52 |
| 3.2 | Rate Schedule to Laem Chabang (Thailand) | 53-55 |
| 3.3 | Rate Schedule to Shanghai (China) | 56-58 |
| 3.4 | Rate Schedule to Dalian (China) | 59-61 |
| 3.5 | Rate Schedule to Xingang (China) | 62-64 |
| 3.6 | Rate Schedule to Kuantan (East Malaysia) | 65-67 |
| 3.7 | Rate Schedule to Port Klang (East Malaysia) | 68-70 |
| 3.8 | Rate Schedule to Chicago / Camden / Philadelphia  (U.S.A - East Coast) | 71-73 |



**MODEC**

**Master Freight Forwarding Services Subcontract**

| Appendix | Description | Page |
|---|---|---|
| 3.9 | Rate Schedule to San Francisco / Los Angeles (U.S.A - West Coast) | 74-76 |
| 3.10 | Rate Schedule to Houston (U.S.A - Gulf Coast) | 77-79 |
| 3.11 | Rate Schedule to Santos (Brazil) | 80-82 |
| 3.12 | Rate Schedule to Rio De Janerio (Brazil) | 83-85 |
| 3.13 | Rate Schedule to Salvador (Brazil) | 86-88 |
| 3.14 | Rate Schedule to Tema ( Ghana ) | 89-91 |
| 3.15 | Rate Schedule to Tokyo / Yokohama (Japan) | 92-93 |
| 3.16 | Rate Schedule to Chiba (Japan) | 94-95 |
| | | |
| 4.1 | Terminal Handling Charges - Applicable to all FCL Import | 96 |
| 4.2 | Terminal Handling Charges - Applicable to all FCL Export | 97 |
| 5 | LCL Freight Rate Schedule (Singapore) | 98 |
| 6.1 / 6.2 | Export Packing Rate Schedule / Warehousing Rate Schedule | 99 |
| 7 | Domestic Freight Forwarding Services - Singapore | 100 |
| 8 | Domestic Freight Forwarding Services - Bangkok & Laem Chabang, Thailand | 101-102 |
| 9 | Domestic Freight Forwarding Services - China | 103-104 |
| 10 | Bonded Logistics Charges in Tianjin/Tanggu/Dalian | 105-106 |
| 11 | USA Domestic Freight Forwarding Services | 107 |
| 12 | USA Trucking | 108-109 |
| 13 | Domestic  Freight Forwarding Services - Others | 110-113 |
| 14 | Domestic  Freight Forwarding Services - Brazil | 114-117 |
| 15 | Domestic Freight Forwarding Services - Ghana | 118-119 |
| 16 | Out of Gauge Cargo List | 120-122 |
| 17 | Out of Gauge Cargo List | 123 |
| 18 | Out of Gauge Cargo List | 124-127 |
| 19 | "Out of Contract" Mark Up | 128 |
| 20 | "Out Of Contract" Approval Form | 129 |
| | | |


**MODEC**

# EXHIBIT B

 **MODEC**

Freight Forwarding and Logistics Services
TEN Development Project
WT366-WO-098

## WORK ORDER WT366-WO-098

Pursuant to Master Freight Forwarding Agreement dated 1st July 2014, between **MODEC Offshore Production Systems (Singapore) Pte Ltd** ("*CONTRACTOR*") and **Panalpina World Transport (Singapore) Pte Ltd** ("*SUBCONTRACTOR*"), this Work Order No. WT366-WO-098 is entered into on 30 November 2014 in respect of the SUBCONTRACTOR's Services as listed below:

**WHEREAS**, SUBCONTRACTOR is in the business of providing freight forwarding and logistics services; and

**WHEREAS**, CONTRACTOR has entered into an agreement with its client Tullow Ghana Limited to provide a Floating Production, Storage and Offloading (FPSO) unit for installation and operation offshore Ghana for the TEN Development Project ("Main Contract"); and

**WHEREAS**, CONTRACTOR has a need for freight forwarding services and other such services provided by SUBCONTRACTOR in order to fulfill its obligations under the Main Contract; and

**NOW, THEREFORE, FOR AND IN CONSIDERATION** of the mutual covenants and promises contained herein and for other good and valuable consideration, CONTRACTOR and SUBCONTRACTOR hereby enter into this Subcontract which shall be the basis and controlling contract document governing all works or services performed by SUBCONTRACTOR for CONTRACTOR.

The following documents shall form this Subcontract and are incorporated herein for all purposes and listed in order of priority as provided below, except that the Special Conditions shall take precedence over the Master Freight Forwarding Agreement:

- Master Freight Forwarding Agreement dated 1st July 2014 & Appendices:
    - Appendix A - Form of Work Order
    - Appendix B - Schedule of Unit Rates
- Attachment 1 - Special Conditions for the TEN Development Project: FPSO Package
- This Work Order No: WT366-WO-096 and its Exhibits:
    - Exhibit E      Compensation and Payment
    - Exhibit I       HSSE Requirements
    - Exhibits A-D, F-H & J (Not Used)

This Subcontract embodies the entire contract between CONTRACTOR and SUBCONTRACTOR and supersedes all other writings.   The parties shall not be bound by or be liable for any statement, representation, promise, inducement or understanding not set forth in the said contract.

**(1)     SUBCONTRACTOR Services:**
SUBCONTRACTOR will provide freight forwarding and logistics services for the transport of 6 units of Compressors, FCA Man Diesel & Turbo Schweiz AG (hereinafter "Seller") facility in Switzerland to DAP Aibel Fabrication Yard in Thailand FOT.

**(2)     Location of Services to be provided by SUBCONTRACTOR:**
The Services shall be performed at CONTRACTOR's offices as defined in Section (5) - Additional Project Information of this Work Order, or other locations as designated by CONTRACTOR.

CONTRACTOR _____  SUBCONTRACTOR _____

 **MODEC**

Freight Forwarding and Logistics Services
TEN Development Project
WT366-WO-098

(3)     **Period for the Services to be provided by SUBCONTRACTOR:**

The period for the provision of SUBCONTRACTOR's Services under this Work Order is 01 December 2014 through 30 January 2015.

(4)     **Fees/Charges payable to SUBCONTRACTOR for the above Services:**

SUBCONTRACTOR shall be compensated according to Exhibit E - Compensation and Payment attached herein.

(5)     **Additional Project Information:**

| I/N | CATEGORY | | |
|-----|----------|---|---|
| 1.0 | Name of Client | : | Tullow Ghana Limited / MV25 |
| 2.0 | CONTRACTOR Entity | : | MODEC Offshore Production Systems (Singapore) Pte Ltd |
| 3.0 | Project No. | : | WT366 |
| 4.0 | Name of Project | | TEN Development Project |
| 5.0 | CONTRACTOR'S Representative: | : | (1) Judy Marie Leong, Logistics Manager<br>Email Address: judy.marie@modec.com<br>or her designated representative<br>and copied to (2) Graham Mills, Project Contracts Manager<br>Email Address: Graham.Mills@modec.com |
| | SUBCONTRACTOR'S Representative and nominated personnel: | : | To be nominated and to be approved by CONTRACTOR prior to mobilization.<br>Any subsequent substitution of SUBCONTRACTOR's nominated personnel shall be subjected to approval of CONTRACTOR prior to mobilization. |
| 6.0 | Location of CONTRACTOR'S Office. | : | 9 North Buona Vista Drive,<br>#21-01 The Metropolis Tower 1<br>Singapore 138588 |

**IN WITNESS WHEREOF,** this Work Order is signed by the duly authorized representatives of the Parties hereto on the day and year set out below.

**MODEC OFFSHORE PRODUCTION SYSTEMS (SINGAPORE) PTE LTD**

By:
Name:   Jeff Knox
Title:      Project Manager
Date:     01 December 2014

**PANALPINA WORLD TRANSPORT (SINGAPORE) PTE LTD**

By:
Name:   ~~Dan Chua~~
Title:      ~~Senior Vice President~~
Date:     01 December 2014

Desmond Lim
Country Manager Singapore

CONTRACTOR _____ SUBCONTRACTOR _____

# EXHIBIT C

# RAJAH & TANN

**M/s AsiaLegal LLC**                                              By Post & Fax No. 6333 1191
3 Church Street
#19-03 Samsung Hub
Singapore 049483

*Attention : Ms Magdelene Chew / Ms Madhavi Arya*

| SENDER'S REF | RECIPIENT'S REF | DATE | NO. OF PAGE(S) |
|---|---|---|---|
| AWP/TSQ/330613/1 | MC/MR/2015124742 | 15 April 2016 | 4 |

**CLAIM BY MODEC OFFSHORE PRODUCTION SYSTEMS (SINGAPORE) PTE LTD IN RELATION TO THE TEN DEVELOPMENT PROJECT: FPSO**

Dear Sirs

1.    We act for MODEC Offshore Production Systems (Singapore) Pte. Ltd ("**MOPS**") and refer to your letter dated 14 April 2016 in relation to the dead freight issue.

2.    We are instructed as follows :-

    (1)    Our clients have entered into a Master Freight Forwarding Services Contract with your client on 1 July 2014 ("**the Master Agreement**").

    (2)    Pursuant to Clause 2.2 of the Master Agreement, parties agreed on an assignment on 30 November 2014 known as Work Order No. WT366-WO-098 ("**WO98**"), wherein your client agreed to provide freight forwarding and logistics services for the transport of 6 units compressors (and their motors), FCA from the facility of the seller, MAN Diesel & Turbo Schweiz Ag in Switzerland to Aibel Fabrication Yard in Thailand.

    (3)    Your clients shipped the first 3 units of compressors in 6 packages, consisting of three compressor skids and three units of electric motors, on board the vessel, MV "Alina" ("**the Vessel**") from the port of Antwerp with an eventual destination of Laem Chabang, Thailand.

    (4)    On or around 27 December 2014, the Vessel encountered heavy weather after departing Le Havre, causing some of her cargo to shift within the cargo hold and causing damage to the Vessel and cargo. As a result, the Vessel was diverted to Newcastle.

    (5)    We understand that the three compressor skids on board the Vessel suffered superficial contamination and minor damage. The compressor skids were therefore shipped on or

RAJAH & TANN SINGAPORE LLP
9 Battery Road #25-01, Straits Trading Building, Singapore 049910   T  65 6535 3600   F  65 6225 9630   *www.rajahtannasia.com*
We are registered in Singapore with limited liability (UEN T08LL0005E). We do not accept service of court documents by fax.

# RAJAH & TANN

around 25 January 2015 onwards to Thailand from Newcastle by a replacement vessel arranged by your clients; and

(6)     As for the three electric motors that were on board the Vessel, upon initial inspection, they appeared to have suffered superficial damage and our clients made arrangements with your clients to ship the motors on board the vessel, MV "Atlantic Dawn". However, it was eventually ascertained that the motors were seriously damaged and had to undergo substantial repair at their manufacturer in Norwich, UK. Accordingly, our clients had no choice but to cancel the shipment on board MV "Atlantic Dawn". In this regard, your clients have, however, sought to invoice our clients for the alleged dead freight costs of USD520,000 ("**the Alleged Dead Freight Claim**").

(7)     Eventually, the repaired motors were shipped to Aibel Fabrication Yard in Thailand and additional costs were incurred for all three motors for their separate and delayed integration into their respective compressor skids.

3.     Accordingly, by reason of the damaged cargo, our clients had incurred and/or would incur, *inter alia*, the following costs :-

| S/No. | Description | Amount (US$) |
|-------|-------------|--------------|
| (1) | Our clients' attendance for inspection of damaged cargo in Newcastle | 17,458 |
| (2) | MAN Diesel & Turbo attendance for inspection in New Castle as well as ATB-Laurence Scott attendance and motor repair costs | 820,465 |
| (3) | Additional costs at Aibel (Thailand) Ltd for cranes & labour to install delayed compressor skids and motors in their respective modules | 371,372 |
| (4) | Shipment of repaired motors from Norwich to Thailand by Panalpina, which has been paid | 191,150 |
| (5) | Shipment of compressor skids from Newcastle to Aibel, Thailand, by your clients, which is the subject matter of High Court Suit No. 240 of 2016 | 641,250 |
| (6) | Alleged Dead Freight Claim | 520,000 |
| | **Total** | **2,561,695** |

RAJAH & TANN

4.      Clause 6.0 of the Master Agreement (which applies to WO98) provides as follows :

> *"[Panalpina] shall be liable…in any case of loss or damage to any member of [Panalpina Group's] property,
> equipment, barges, and tugs, whether owned or rendered and operated by any member of [Panalpina Group]
> and including the property which is the subject of the Services arising out of or
> relating to the performance of the Services under [the Master Agreement] …and
> [Panalpina] shall defend, protect, indemnify and hold harmless all members of
> [Contractor Group i.e. including MOPS] from and against any loss, cost, claim,
> obligation to indemnify another, suit, judgment, award or damage (including
> reasonable attorney's fees) on account of such illness, injury, death, loss or damage".*

> "Services" as defined in Section (1) of WO98 are the freight forwarding and logistics
> services provided by your client for the transport of the 6 units of compressors from
> Switzerland to Thailand.

5.      Clause 6.0 of the Master Agreement further provides that *"notwithstanding anything to the contrary
contained herein or elsewhere, for all claims related to or arising out of any loss, damage or destruction of cargo,
[Panalpina's] liability shall be the actual value of the lost, destroyed or damaged cargo not to exceed $1,000,000 per
occurrence nor $3,000,000 in an annual aggregate. [Panalpina's] liability for any negligence freight forwarding and
customs services shall be the actual damage not to exceeds $1,000,000 per occurrence nor $3,000,00 per year"*

6.      By reason of the indemnity provided by your clients under Clause 6.0 of the Master Agreement, your
clients are obliged to indemnify MOPS in relation to all claims related to or arising from the *inter alia*
damaged cargo. On this basis, all costs incurred by our clients by reason of the damaged cargo as set
out in the table at [3] above, including your clients' alleged claim for "dead freight", must accordingly
be borne by your clients.

7.      In any event, it should be highlighted that :-

(1)     the shipment of the three damaged motors to Thailand on board the vessel, "MV Atlantic
Dawn" was eventually cancelled and no services were provided by your clients;

(2)     the documents provided under cover of your clients' email dated 11 April 2016 to our clients
did not include any proof of payment and/or that your clients had indeed incurred any costs
in relation to the dead freight; and

(3)     without further proof that your clients had incurred costs in relation to this shipment, our
client cannot see any basis for liability to be imputed to them for "dead freight".

3

# RAJAH & TANN

8.   **TAKE NOTICE** that our clients **HEREBY DEMAND** that your clients pay to our clients the sum of **US$1,000,000** pursuant to Clause 6.0 of the Master Agreement, in connection with the damaged cargo arising from WO98.

9.   All our clients' rights are reserved.

Yours faithfully

*[signature]*

**Rajah & Tann Singapore LLP**
*(Adrian Wong / Teo Shu Qiu)*

T   (+65) 6232 0427 / 0688
F   (+65) 6225 8349
E   adrian.wong@rajahtann.com / shu.qiu.teo@rajahtann.com

cc. clients

# EXHIBIT D

# RAJAH & TANN

**Messrs Asia Legal LLC**
3 Church Street
#19-03 Samsung Hub
Singapore 049483

**By**     Hand

*Attention: Ms Magdalene Chew/ Ms Marie Ravindran*

| SENDER'S REF | RECIPIENT'S REF | DATE | PAGE |
|---|---|---|---|
| AWP/BAA /330613/01 | MC/MR/2015124742 | 17 March 2017 | 1/1 |

**CLAIM BY MODEC OFFSHORE PRODUCTION SYSTEMS (SINGAPORE) PTE LTD IN RELATION TO THE TEN DEVELOPMENT PROJECT: FPSO**

Dear Sirs

1.    We refer to the abovementioned matter. We also refer to our letter dated 15 April 2016 and your reply dated 20 April 2016 ("**your letter**"). A copy of our letter dated 15 April 2016 is enclosed herewith for your convenience.

2.    In your letter, it was alleged that our clients had failed to *"fully substantiate...or document"* its claim in respect of Clause 6.0 of the Master Freight Forwarding Services Contract dated 1 July 2014 (the "**Master Agreement**"). Although your clients are well aware of the nature of our clients' claim, our clients have collated the relevant documents relating to its claim to expedite matters. A copy of the aforesaid documents is enclosed for your client's attention.

3.    In the light of the above, our clients repeat their demand for payment of the sum of US$1,000,000 (the "**Sum**") pursuant to Clause 6.0 of the Master Agreement, which is owed in connection with the damaged cargo arising from Work Order No. WT366-WO-098.

4.    If the aforesaid Sum is not received by us, as our clients' solicitors, within 7 days hereof, our clients shall proceed to commence proceedings against your client without further notice.

5.    All our clients' rights are reserved.

Yours faithfully

**RAJAH & TANN SINGAPORE LLP**
*Adrian Wong / Andrea Baker*

T    (65) 6232 0427 / 0395
F    (65) 6225 8349
E    adrian.wong@rajahtann.com / andrea.baker@rajahtann.com

cc    clients
encl.



RECEIVED
1 7 MAR 2017
ASIALEGAL LLC

RAJAH & TANN SINGAPORE LLP
9 Battery Road #25-01, Singapore 049910   T +65 6535 3600   F +65 6225 9630   *www.rajahtannasia.com*
We are registered in Singapore with limited liability (UEN T08LL0005E). We do not accept service of court documents by fax.

MEMBER OF RAJAH & TANN ASIA NETWORK

CAMBODIA | CHINA | INDONESIA | LAO PDR | MALAYSIA | MYANMAR | PHILIPPINES | SINGAPORE | THAILAND | VIETNAM

# RAJAH & TANN

**M/s AsiaLegal LLC**
3 Church Street
#19-03 Samsung Hub
Singapore 049483

*By Post & Fax No. 6333 1191*

*Attention : Ms Magdelene Chew / Ms Madhavi Arya*

| SENDER'S REF | RECIPIENT'S REF | DATE | NO. OF PAGE(S) |
|---|---|---|---|
| AWP/TSQ/330613/1 | MC/MR/2015124742 | 15 April 2016 | 4 |

**CLAIM BY MODEC OFFSHORE PRODUCTION SYSTEMS (SINGAPORE) PTE LTD IN RELATION TO THE TEN DEVELOPMENT PROJECT: FPSO**

Dear Sirs

1.      We act for MODEC Offshore Production Systems (Singapore) Pte. Ltd ("**MOPS**") and refer to your letter dated 14 April 2016 in relation to the dead freight issue.

2.      We are instructed as follows :-

> (1)     Our clients have entered into a Master Freight Forwarding Services Contract with your client on 1 July 2014 ("**the Master Agreement**").

> (2)     Pursuant to Clause 2.2 of the Master Agreement, parties agreed on an assignment on 30 November 2014 known as Work Order No. WT366-WO-098 ("**WO98**"), wherein your client agreed to provide freight forwarding and logistics services for the transport of 6 units compressors (and their motors), FCA from the facility of the seller, MAN Diesel & Turbo Schweiz Ag in Switzerland to Aibel Fabrication Yard in Thailand.

> (3)     Your clients shipped the first 3 units of compressors in 6 packages, consisting of three compressor skids and three units of electric motors, on board the vessel, MV "Alina" ("**the Vessel**") from the port of Antwerp with an eventual destination of Laem Chabang, Thailand.

> (4)     On or around 27 December 2014, the Vessel encountered heavy weather after departing Le Havre, causing some of her cargo to shift within the cargo hold and causing damage to the Vessel and cargo. As a result, the Vessel was diverted to Newcastle.

> (5)     We understand that the three compressor skids on board the Vessel suffered superficial contamination and minor damage. The compressor skids were therefore shipped on or

RAJAH & TANN SINGAPORE LLP
9 Battery Road #25-01, Straits Trading Building, Singapore 049910  T  65 6535 3600  F  65 6225 9630  *www.rajahtannasia.com*
We are registered in Singapore with limited liability (UEN T08LL0005E). We do not accept service of court documents by fax.

# RAJAH & TANN

around 25 January 2015 onwards to Thailand from Newcastle by a replacement vessel arranged by your clients; and

(6) As for the three electric motors that were on board the Vessel, upon initial inspection, they appeared to have suffered superficial damage and our clients made arrangements with your clients to ship the motors on board the vessel, MV "Atlantic Dawn". However, it was eventually ascertained that the motors were seriously damaged and had to undergo substantial repair at their manufacturer in Norwich, UK. Accordingly, our clients had no choice but to cancel the shipment on board MV "Atlantic Dawn". In this regard, your clients have, however, sought to invoice our clients for the alleged dead freight costs of USD520,000 ("**the Alleged Dead Freight Claim**").

(7) Eventually, the repaired motors were shipped to Aibel Fabrication Yard in Thailand and additional costs were incurred for all three motors for their separate and delayed integration into their respective compressor skids.

3. Accordingly, by reason of the damaged cargo, our clients had incurred and/or would incur, *inter alia*, the following costs :-

| S/No. | Description | Amount (US$) |
|-------|-------------|--------------|
| (1) | Our clients' attendance for inspection of damaged cargo in Newcastle | 17,458 |
| (2) | MAN Diesel & Turbo attendance for inspection in New Castle as well as ATB-Laurence Scott attendance and motor repair costs | 820,465 |
| (3) | Additional costs at Aibel (Thailand) Ltd for cranes & labour to install delayed compressor skids and motors in their respective modules | 371,372 |
| (4) | Shipment of repaired motors from Norwich to Thailand by Panalpina, which has been paid | 191,150 |
| (5) | Shipment of compressor skids from Newcastle to Aibel, Thailand, by your clients, which is the subject matter of High Court Suit No. 240 of 2016 | 641,250 |
| (6) | Alleged Dead Freight Claim | 520,000 |
| | **Total** | **2,561,695** |

2

# RAJAH & TANN

4.  Clause 6.0 of the Master Agreement (which applies to WO98) provides as follows :

> "*[Panalpina] shall be liable…in any case of loss or damage to any member of [Panalpina Group's] property, equipment, barges, and tugs, whether owned or rendered and operated by any member of [Panalpina Group] and including the property which is the subject of the Services arising out of or relating to the performance of the Services under [the Master Agreement] …and [Panalpina] shall defend, protect, indemnify and hold harmless all members of [Contractor Group i.e. including MOPS] from and against any loss, cost, claim, obligation to indemnify another, suit, judgment, award or damage (including reasonable attorney's fees) on account of such illness, injury, death, loss or damage*".

> "Services" as defined in Section (1) of WO98 are the freight forwarding and logistics services provided by your client for the transport of the 6 units of compressors from Switzerland to Thailand.

5.  Clause 6.0 of the Master Agreement further provides that "*notwithstanding anything to the contrary contained herein or elsewhere, for all claims related to or arising out of any loss, damage or destruction of cargo, [Panalpina's] liability shall be the actual value of the lost, destroyed or damaged cargo not to exceed $1,000,000 per occurrence nor $3,000,000 in an annual aggregate. [Panalpina's] liability for any negligence freight forwarding and customs services shall be the actual damage not to exceeds $1,000,000 per occurrence nor $3,000,00 per year*"

6.  By reason of the indemnity provided by your clients under Clause 6.0 of the Master Agreement, your clients are obliged to indemnify MOPS in relation to all claims related to or arising from the *inter alia* damaged cargo. On this basis, all costs incurred by our clients by reason of the damaged cargo as set out in the table at [3] above, including your clients' alleged claim for "dead freight", must accordingly be borne by your clients.

7.  In any event, it should be highlighted that :-

    (1)   the shipment of the three damaged motors to Thailand on board the vessel, "MV Atlantic Dawn" was eventually cancelled and no services were provided by your clients;

    (2)   the documents provided under cover of your clients' email dated 11 April 2016 to our clients did not include any proof of payment and/or that your clients had indeed incurred any costs in relation to the dead freight; and

    (3)   without further proof that your clients had incurred costs in relation to this shipment, our client cannot see any basis for liability to be imputed to them for "dead freight".

3

# RAJAH & TANN

8.  **TAKE NOTICE** that our clients **HEREBY DEMAND** that your clients pay to our clients the sum of **US$1,000,000** pursuant to Clause 6.0 of the Master Agreement, in connection with the damaged cargo arising from WO98.

9.  All our clients' rights are reserved.

Yours faithfully

*Rajah & Tann*

**Rajah & Tann Singapore LLP**
*(Adrian Wong / Teo Shu Qiu)*

T   (+65) 6232 0427 / 0688
F   (+65) 6225 8349
E   adrian.wong@rajahtann.com / shu.qiu.teo@rajahtann.com

cc. clients

4

# EXHIBIT E

# ASIALEGAL LLC

Advocates & Solicitors
Notary Public & Commissioner for Oaths

In alliance with Holman Fenwick Willan Singapore LLP

10 Collyer Quay
#18-01 Ocean Financial Centre
Singapore 049315
Website : www.asialegal.com.sg

Tel    : 6333 1121 (After office hours: 9615 6325)
Fax    : 6333 1191
E-mail : mail@asialegal.com.sg
*(Service of Court Documents by fax / email is not accepted)*

Your ref    : AWP/BAA/330613/01
Our ref     : MC/TM/2017035158

4 May 2017

**M/S RAJAH & TANN SINGAPORE LLP**
9 Battery Road #25-01
Singapore 049910

**BY FAX (6225 8349) AND HAND**
(Total No. of Pages: 2)

<u>Attn: Mr. Adrian Wong / Ms. Andrea Baker</u>

Dear Sirs,

**CLAIM BY MODEC OFFSHORE PRODUCTION SYSTEMS (SINGAPORE) PTE LTD IN RELATION TO THE TEN DEVELOPMENT PROJECT: FPSO**

1. We refer to your letter dated 27 April 2017.

2. For ease of reference but without prejudice to our clients' position, we shall adopt the abbreviations used in your letters of 17 March 2017 and 27 April 2017 unless otherwise stated.

3. Again and with respect, our clients instruct that they certainly cannot agree with your clients' allegations and claim and reiterate their denial of any and all of the same that was raised in your letter dated 27 April 2017.

4. Importantly, our clients maintain that the COGSA is applicable and would urge your clients to revisit clause 16.0 of the Master Agreement. The COGSA is *expressly* stated to be applicable to the entire multimodal transport chain in clause 16.0 of the Master Agreement. Lest your clients forget, clause 16.0 of the Master Agreement is an agreed and contractually binding clause. With that in mind, it must have been parties' intention that, for the purpose of the Master Agreement, our clients are to come within the definition of being a "carrier" under the COGSA. Taking a contrary position would render clause 16.0 of the Master Agreement

**Directors**   Timothy Tan   ◈   P. Jeya Putra   ◈   Magdalene Chew
**Consultant**   John P.H. Ng
**Associates**   Wong Teck Ming   ◈   Lim Chuan   ◈   Victoria Lee   ◈   Keith V. Lee

 AsiaLegal   AsiaLegal LLC (Reg. No. 200210126H) is a law corporation incorporated with limited liability. AsiaLegal LLC and Holman Fenwick Willan Singapore LLP are members of HFW AsiaLegal, a Formal Law Alliance registered in Singapore.

**M/S RAJAH & TANN SINGAPORE LLP**

4 May 2017                                                                                          Page 2 of 2

nugatory. Such obvious wordings which explicitly state the applicable law to the Master Agreement cannot be ignored by your clients simply to argue that their claim is not time-barred which our clients maintain is the case.

5.  Further, as you have pointed out, if your clients take the position that the damage to the cargo was caused by *"reason of the failure to properly secure/lash other cargo on board the 'MV Alina'"*, they should appreciate that such failure was not within the control or scope of responsibility of our clients at the material time. Our clients maintain that your clients' claim should be made against the carrier named in the Bill of Lading to which our clients are not a party to.

6.  To conclude, our clients deny any and all liability for the Sum and will not make payment of the same to your clients. We note your clients' insistence on commencing legal proceedings against our clients despite having no basis to do so, and in this regard, our clients shall draw your clients' attention to clause 18.5 of the Master Agreement which provides that all disputes are to be referred to arbitration in Houston, Texas and which is self-explanatory.

7.  We trust that your clients will not, once again, deliberately ignore the clear words of the Master Agreement. If your clients choose to make the unnecessary decision of commencing legal proceedings against our clients in Singapore, our clients will apply for a stay of proceedings in favour of arbitration and will look to your clients for all costs on an indemnity basis.

8.  In the interim, all our clients' rights are hereby expressly reserved.


Yours Faithfully,

*Asia Legal*

Magdalene Chew / Wong Teck Ming
DID: 6538 4384 / 6557 2575
Email: magdalene@asialegal.com.sg / teckming@asialegal.com.sg

cc. clients

**ASIALEGAL LLC**
In alliance with Holman Fenwick Willan Singapore LLP
10 Collyer Quay
#18-01/08 Ocean Financial Centre
Singapore 049315
Tel: 6333 1121    Fax: 6333 1191
mail@asialegal.com.sg

# EXHIBIT F

# RAJAH & TANN

| | |
|---|---|
| **Messrs Asia Legal LLC** | **By Post & Fax (6333 1191)** |
| 10 Collyer Quay | |
| #18-01/08 Ocean Financial Centre | |
| Singapore 049315 | |

*Attention: Ms Magdalene Chew/ Mr Wong Teck Ming*

| SENDER'S REF | RECEIPIENT'S REF | DATE | PAGE |
|---|---|---|---|
| AWP/BAA /330613/01 | MC/MR/2015124742 | 11 May 2017 | 1/2 |

**CLAIM BY MODEC OFFSHORE PRODUCTION SYSTEMS (SINGAPORE) PTE LTD IN RELATION TO THE TEN DEVELOPMENT PROJECT: FPSO**

Dear Sirs

1.  We refer to your letter dated 4 May 2017, the contents of which are denied.

2.  With respect, your clients are turning a blind eye to the clear wording of Section 6 of the COSGA. The fact that it applies only to a "carrier" is incontrovertible.

3.  Your clients' *volte face* in relation to whether or not it is a carrier also speaks volumes. In this regard, your clients had initially taken the position, at paragraph 4 of your earlier letter dated 13 April 2017, that they were **not** carriers. After we pointed out this admission in our letter dated 27 April 2017, your client then changed tune and alleged that they could somehow *"come within the definition of being a "carrier" under the COSGA".* Apart from a bare assertion, no basis has been provided as regards your client's latest position.

4.  We further note that no answer was also provided in relation to your clients' failure to notify our clients of the alleged *force majeure* situation. We reiterate that this is telling.

5.  Our clients are of the view that it would not be fruitful to litigate by correspondence. Accordingly, they shall proceed as they deem fit. Our clients repeat their request for your good firm to confirm within 7 days hereof that it has instructions to accept service of process failing which we shall effect service directly on your clients.

6.  In relation to your clients' indication that any legal proceedings in Singapore would be met with an application for a stay, this option is not open to your clients. Having elected to abandon the arbitration agreement when they commenced Suit No. 240/2016 in the Singapore High Court, it does not lie in their hands now to seek to enforce the same when it is convenient for them to do so. Your clients cannot blow hot and cold.

*[Stamp: RECEIVED 11 MAY 2017 ... LEGAL LLC]*

RAJAH & TANN SINGAPORE LLP
9 Battery Road #25-01, Singapore 049910   T +65 6535 3600   F +65 6225 9630   www.rajahtann.asia
We are registered in Singapore with limited liability (UEN T08LL0005E). We do not accept service of court documents by fax.

MEMBER OF RAJAH & TANN ASIA NETWORK                                                                    1
CAMBODIA | CHINA | INDONESIA | LAO PDR | MALAYSIA | MYANMAR | PHILIPPINES | SINGAPORE | THAILAND | VIETNAM

# RAJAH & TANN

7.      All our clients' rights are reserved.

Yours faithfully

**RAJAH & TANN SINGAPORE LLP**
*Adrian Wong / Andrea Baker*

T    (65) 6232 0427 / 0395
F    (65) 6225 8349
E    adrian.wong@rajahtann.com / andrea.baker@rajahtann.com

cc      clients